UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

IN THE MATTER OF THE COMPLAINT FOR
EXONERATION FROM OR LIMITATION OF
LIABILITY OF FREDERICK WHITE and
JOCELYN SIKORSKI, *as owners and/or owners pro
hac vice of a 1985 34-foot J-Boat sailing vessel*,

          Petitioners.

**DECISION AND ORDER**
19-CV-900S

## I. INTRODUCTION

This is an action under the Limitation of Liability Act of 1851 and Rule F of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions brought by petitioners-in-limitation Jocelyn Sikorski and the Estate of Frederick White ("Petitioners").   They seek exoneration from or limitation of liability arising from the dismasting of the 34-foot sailing vessel *Sound Wave* during a recreational sailboat race on Lake Ontario.

Presently before this Court is Petitioners' motion for summary judgment seeking dismissal of claimant-in-limitation Tracy DeLeo's ("Claimant") claims for maintenance and cure, breach of the warranty of seaworthiness, and negligence.   For the following reasons, Petitioners' motion is granted in part and denied in part.

## II. BACKGROUND

### A.  The Limitation of Liability Act of 1851 and Rule F

The Limitation of Liability Act of 1851 ("the Act"), 46 U.S.C. §§ 30501, et seq., for present purposes, limits a vessel owner's liability to the value of the vessel and its freight

for any damage, including personal injury, caused by a collision that occurs "without the privity or knowledge of the owner."   See 46 U.S.C. § 30505 (b); In re Bensch, 2 F.4th 70, 73 (2d Cir. 2021).   The Second Circuit has explained the Act as follows:

> The animating premise of the statute is that the owner of a vessel is generally an absentee who entrusts the vessel to the command of a captain whom the owner has limited ability to supervise or control once the vessel is on the sea.   Thus, in what we have described as an effort "to encourage the development of American merchant shipping," the Act loosens the normal rules of *respondeat superior* in admiralty cases by allowing shipowners to insulate their personal assets (beyond the value of the ship) in cases where any negligence is committed without the owner's privity or knowledge.

Bensch, 2 F.4th at 73 (quoting Complaint of Dammers & Vanderheide & Scheepvaart Maats Christina B.V., 836 F.2d 750, 754 (2d Cir. 1988), in turn quoting, Lake Tankers Corp. v. Henn, 354 U.S. 147, 150, 77 S. Ct. 1269, 1 L. Ed. 2d 1246 (1957)).   "In effect, the statute creates a federal admiralty forum in which the owner may seek limitation of liability by establishing that he was not at fault with respect to the collision."   Bensch, 2 F. 4th at 73; Tandon v. Captain's Cove Marina of Bridgeport, 752 F.3d 239, 244 (2d Cir. 2014) ("The Act thus protects the owner of a vessel from unlimited vicarious liability for damages caused by the negligence of his captain or crew.").

To secure relief under the Act, a vessel owner must file a complaint for limitation of liability—more often referred to as a "petition," see Tandon, 752 F.3d at 240 n.1—in federal district court within six months of receiving written notice of a claim and must post security in the amount of his or her interest in the vessel and any freight.   See 46 U.S.C. § 30511 (a); Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture

Actions ("Supp. R.") Rule F (1).   The complaint "may demand exoneration from as well as limitation of liability," and, by rule, must contain specific factual allegations, such as "the facts on the basis of which the right to limit liability is asserted and all facts necessary to enable the court to determine the amount to which the owner's liability shall be limited." Supp. R. F (2).   The complaint must further contain specific facts concerning the voyage at issue, the amount of all known demands and claims arising from the voyage, the status (i.e., whether damaged, lost, or abandoned) and value of the vessel, and the amount of any freight.   See id.

Once a compliant complaint is filed, "all claims and proceedings against the [vessel] owner or the [vessel] owner's property with respect to the matter in question shall cease."   Supp. R. F (3).   Upon the plaintiff's application, the court must "enjoin the further prosecution of any action or proceeding against the plaintiff or the plaintiff's property with respect to any claim subject to limitation in the action."   Id.   The rules then require notice and publication of notice to all persons asserting claims with respect to which the complaint seeks limitation.   See Supp. R. F (4).   The notice must "admonish[ ] [potential claimants] to file their respective claims with the clerk of the court and to serve on the attorneys for the plaintiff a copy thereof on or before a date to be named in the notice," which date shall not be less than 30 days from issuance of the notice.   Id.

Thereafter, claims must be timely filed and served and must specify "the facts upon which the claimant relies in support of the claim, the items thereof, and the dates on which the same accrued."   Supp. R. F (5).   "If a claimant desires to contest either the right to exoneration from or the right to limitation of liability the claimant shall file and serve an

answer to the complaint unless the claim has included an answer."   Id.

After pretrial proceedings are concluded, the court sits in admiralty, without a jury, to conduct a *concursus* proceeding, "during which the court determines whether there was negligence, whether the negligence was without the privity and knowledge of the owner and, if limitation is granted, how the limitation fund should be disbursed."   In re Nagler, 246 F. Supp. 3d 648, 656 (E.D.N.Y. 2017); see also Otal Investments Ltd. v. M/V CLARY, 673 F.3d 108, 115 (2d Cir. 2012) ("First, the court must determine what acts of negligence . . . caused the accident.   Second, the court must determine whether the ship owner had knowledge or privity of those same acts of negligence . . .." (quoting In Re Moran Towing Corp., 166 F. Supp. 2d 773, 775 (E.D.N.Y. 2001)).   "[T]he court must determine whether the accident was caused by conduct that is actionable, for 'if there was no fault or negligence for the shipowner to be privy to or have knowledge of within the meaning of the statute, there is no liability to be limited,' and the owner would then be entitled to exoneration."   In re Messina, 574 F.3d 119, 126 (2d Cir. 2009) (quoting The 84-H, 296 F. 427, 432 (2d Cir. 1923)).   The claimant "'bears the initial burden of proving negligence,' after which the burden shifts to the shipowner to prove lack of knowledge or privity."   Otal, 673 F.3d at 115 (quoting Moran Towing, 166 F. Supp. at 775).   "If the petition for limitation of liability is granted, the owner can be liable on the covered claims only up to the total value of his vessel and its pending freight; that amount will then be distributed pro rata among the proven claims."   Tandon, 752 F.3d at 244 (citing Supp. R. F (8)).

**B.  Facts**

4

Unless otherwise noted, the following facts are undisputed. Frederick White owned a 34-foot J-Boat sailing vessel called *Sound Wave*. See Petitioners' Rule 56.1 Statement of Undisputed Material Facts ("Petitioners' Statement"), Docket No. 35, ¶¶ 2, 3. It was built in 1985 and had a 52-foot-high mast. See id. ¶ 2; Deposition of Jocelyn Sikorski ("Sikorski Dep."), Docket No. 40-7, p. 16.[1] White's stepdaughter, Petitioner Jocelyn Sikorski, sailed the *Sound Wave* with White's permission in recreational "club races" sponsored by the Olcott Yacht Club.[2] See Petitioners' Statement, ¶¶ 4, 5. Claimant DeLeo also participated in these races aboard the *Sound Wave*. See id. ¶ 7.

On August 23, 2018, Sikorski, DeLeo, and several other women were participating together in a Thursday-evening, women-only "club race" on Lake Ontario. See id. ¶¶ 1, 2, 5. Sikorski was the *Sound Wave's* "skipper," which placed her in charge of the vessel and crew. See id. ¶¶ 4, 16, 31; Sikorski Dep., pp. 14, 33. DeLeo served in the "floor deck" position, which required her to "call the line" at the start of the race and to guide the jib sail around the mast when necessary. See Petitioners' Statement, ¶ 15; Sikorski Dep., pp. 11, 15, 33. Another woman, Patricia Schneider, served as "trimmer" of the jib

---

1 All deposition page citations herein are to the page numbers generated by the court's CM/ECF system.

2 Although Sikorski was not a title owner of the *Sound Wave*, it is undisputed that she is an owner *pro hac vice* for purposes of the Act. Vessel ownership under the Act is construed liberally and generally includes "one who is subjected to a shipowner's liability because of his exercise of dominion over a vessel." Dick v. United States, 671 F.2d 724, 727 (2d Cir. 1982). To determine whether a non-title owner is entitled to ownership status, courts examine the degree of autonomy that the non-title owner exercises over the vessel. For example, *pro hac vice* ownership status is found where the non-title owner had "virtually the responsibility of the record owner," including "manning the vessels; victualing the vessels; providing for navigation, which involved procuring and providing deck, engine and cabin stores; maintenance and repairs for hull and machinery; providing spare parts, maintenance and repairs for communication and navigation equipment," and the like. In re Complaint of Chesapeake Shipping, Inc., 803 F. Supp. 872, 873-74 (S.D.N.Y. 1992). Based on the facts presented, Sikorski qualifies as an owner *pro hac vice* of the *Sound Wave*, and DeLeo does not contend otherwise.

sail.   <u>See</u> Petitioners' Statement, ¶ 21; Sikorski Dep., p. 33; Deposition of Patricia Schneider ("Schneider Dep."), Docket No. 42-1, pp. 36-37.   White did not participate in the race but watched it from a nearby pier.   <u>See</u> Petitioners' Statement, ¶ 6; Deposition of Frederick White ("White Dep."), Docket No. 42, p. 9.

The race occurred on a beautiful night in a light wind of approximately eight knots. <u>See</u> Deposition of Tracy DeLeo ("DeLeo Dep."), Docket No. 41, p. 30; Schneider Dep., pp. 41, 44, 63.   But as the *Sound Wave* tacked around a mark, it dismasted.   <u>See</u> Petitioners' Statement, ¶¶ 1, 2, 5, 28; DeLeo Dep., pp. 32, 35; Sikorski Dep., p. 41; White Dep., p. 18; Schneider Dep., pp. 45, 46, 77.   Schneider described the dismasting as follows: " . . . [the mast] started to go, and it didn't . . . it didn't fall.   It didn't go like a tree in the woods.   It was a . . . the whole boat went.   You know, like the boat heeled and the . . . and it went down into the water . . . ."   Schneider Dep., p. 97.

DeLeo testified that she was on the low side of the boat at the time of the dismasting "skirting the jib" to ensure that it did not become stuck as it was being brought in.   DeLeo Dep., pp. 36, 37.   Schneider testified that DeLeo was sitting on the cabin top aft of the mast as the mast began to fall and then scrambled to the high side of the boat as it keeled.   Schneider Dep., pp. 52, 82-83.   Sikorski testified that DeLeo was on the high side of the boat and that the mast came down on the low side.   Sikorski Dep., p. 53.

DeLeo contends that the mast landed on her and pinned her face-down to the top of the cabin, causing her personal injuries, including spinal fractures and shoulder impingement.   <u>See</u> Claimant's Response to Statement of Undisputed Material Facts ("Claimant's Response"), Docket No. 40-2, ¶ 41; DeLeo Dep., p. 38.   Sikorski testified

6

that the mast and rigging could not have hit DeLeo because it "fell as one big piece down the starboard side into the water."   Sikorski Dep., p. 51.   Schneider also testified that neither the mast nor rigging hit DeLeo because it all fell into the water, not onto the deck. Schneider Dep., pp. 56, 83, 97, 98.

DeLeo maintains that loose shrouds or failed welds or both caused the mast to break.   See Claimant's Response, ¶¶ 26, 28, 29, 39, 40.   She maintains that the shrouds were loose on the day of the incident, and that she told Sikorski that they were loose. See id. ¶¶ 26, 29, 38.   DeLeo further maintains that White negligently repaired the mast after a previous dismasting in 2016, rather than replace it.   See id. ¶ 28.   In DeLeo's estimation, two welds used to complete the 2016 repair failed, causing the second dismasting on August 23, 2018.   See id. ¶¶ 27, 28.

In the 15 years before this incident, DeLeo often participated in recreational sailboat races as part of the *Sound Wave* racing crew, the composition of which varied depending on individual availability.   See Petitioners' Statement, ¶¶ 7, 11, 12.   From 2003 to 2011, DeLeo typically sailed aboard the *Sound Wave* thrice weekly in various races sponsored by the Olcott Yacht Club.   See id. ¶ 8.   After her child was born in 2011, and continuing through 2018, DeLeo reduced her participation to just the weekly Thursday-night women's races, which typically lasted 60-90 minutes.   See id. ¶¶ 9, 13, 24.   There were nine or so such races per season, and DeLeo generally participated when she was available.   See id. ¶¶ 10, 11, 13.

DeLeo, who is employed as a pension administrator at an accounting firm, considered sailing her hobby.   See id. ¶¶ 22, 23.   Neither she nor any of the other racing

7

crew members were professional sailors.   See id. ¶ 17.   None were paid to race the *Sound Wave*, and none had employment contracts with White or Sikorski.   See id. ¶¶ 18-20.   Race participation was voluntary and recreational; there was no prize money or other remuneration.   See id. ¶¶ 18, 21, 22.

### C. Procedural History

On June 19, 2019, DeLeo sued White in New York state court to recover for her injuries.   See Petitioners' Statement, ¶ 33.   Three weeks later, White and Sikorski filed their complaint in this action, pursuant to Supp. R. F (1).   See Docket No. 1.   This Court thereafter issued the orders required under Rule F (3) (injunction) and (4) (notice).   See Docket Nos. 2, 3.   DeLeo filed an answer and a claim on August 29, 2019, consistent with Supp. R. F (5), after which this Court referred the matter to the magistrate judge for supervision of pretrial proceedings.   See Docket Nos. 4-6.

Discovery proceedings commenced with the Rule 16 conference and issuance of a case-management order on November 14, 2019.   See Docket Nos. 14, 15.   After discovery concluded, Sikorski timely filed the pending motion for summary judgment on January 29, 2021, which the Estate of Frederick White later joined.[3]   See Docket Nos. 33, 55.   After full briefing, including supplemental briefing, this Court took the motion for summary judgment under advisement without oral argument on November 8, 2021.   See Docket Nos. 33, 34-36, 40-44, 56, 57.

---

3 Kathryn J. White, as Administratrix of the Estate of Frederick White, was substituted under Rule 25 (a)(1) of the Federal Rules of Civil Procedure after Frederick White passed away on November 19, 2020.   See In re White, 19-CV-900S, 2021 WL 3931142 (W.D.N.Y. Sept. 2, 2021); Docket No. 51.

## III. DISCUSSION

### A. Subject-Matter Jurisdiction

The Limitation of Liability Act itself does not give rise to federal admiralty jurisdiction.   See MLC Fishing, Inc. v. Velez, 667 F.3d 140, 141-42 (2d Cir. 2011) (per curiam) (noting that the Act "does not provide an independent foundation for federal admiralty jurisdiction").   Although a petition under the Act "is a form of action peculiar to the admiralty and maritime context," Tandon, 752 F.3d at 243, "the district court will only have admiralty jurisdiction to hear a petition for limitation if it already has admiralty jurisdiction over the underlying claims that the petition seeks to limit," id. at 244 (citing MLC Fishing, 667 F.3d at 143-44).   The jurisdictional question is thus "'whether the underlying claims raise a 'civil case of admiralty or maritime jurisdiction' that the district court could hear under 28 U.S.C. § 1333 (1).'"   In re Germain, 824 F.3d 258, 265 (2d Cir. 2016) (quoting Tandon, 752 F.3d at 244).

The federal Constitution dictates that "[t]he judicial Power shall extend . . . to all Cases of admiralty and maritime Jurisdiction."   U.S. Const. art. III, § 2.   This provision is codified in 28 U.S.C. § 1333 (1), which provides that "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of . . . [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."[4]

_____

4 While numerous courts and commentators have struggled to reconcile the grant of exclusive federal admiralty jurisdiction with the reservation of rights in the saving-to-suitors clause, there is no reason to do so here, where Claimant DeLeo concedes federal subject-matter jurisdiction and has not invoked the saving-to-suitors clause to avoid it.   See, e.g., Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 443, 121 S. Ct. 993, 148 L. Ed. 2d 931 (2001) ("What the drafters of the Judiciary Act intended in creating the saving

Admiralty jurisdiction over tort claims is proper if two tests are met—the location and connection tests.   See, e.g., Germain, 824 F.3d at 265-70 (tracing historical development of the tests); Tandon, 752 F.3d at 244-48.   Known collectively as the Grubart test, the two tests are intended to "weed out torts without a maritime connection." Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 542 n. 4, 115 S. Ct. 1043, 130 L. Ed. 2d 1024 (1995) (citing Sisson v. Ruby, 497 U.S. 358, 110 S. Ct. 2892, 111 L. Ed. 2d 292 (1990)).   To satisfy the location test, the tort must have occurred on navigable water or have been caused by a vessel on navigable water.   See Tandon, 752 F. 3d at 248 (restating the Grubart test).   To satisfy the connection test, two subparts must be met.   First, the general type of incident giving rise to the tort must have a potentially disruptive effect on maritime commerce.   See id.   Second, the general character of the incident must bear a substantial relationship to traditional maritime activity.   See id.   "Only if the location test and both subparts of the connection test are met will admiralty tort jurisdiction be proper under 28 U.S.C. § 1333 (1)."   Id.

This Court is satisfied that subject-matter jurisdiction is proper here.   See United States v. Bond, 762 F. 3d 255, 263 (2d Cir. 2014) ("Subject matter jurisdiction is a 'threshold question that must be resolved . . . before proceeding to the merits.'") (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89, 118 S. Ct. 1003, 140 L. Ed.

---

to suitors clause is not entirely clear and has been the subject of some debate.") (citing scholarly works); In re Germain, 824 F.3d 258 (2d Cir. 2016) ("The interaction between the exclusivity clause and the saving-to-suitors clause of § 1331 (1) has caused much confusion."); Nassau Cty. Bridge Auth. v. Olsen, 130 F. Supp. 3d 753, 763 (E.D.N.Y. 2015 (collecting cases); see also Answer, Docket No. 4, ¶ 2 (b) (admitting proper subject-matter jurisdiction); Claim-in-Limitation, Docket No. 5 ("Jurisdiction over this claim exists under the Honorable Court's general maritime jurisdiction, 28 USC § 1331.").

2d 210 (1998)).   The torts at issue are alleged to have occurred on a vessel navigating the waters of Lake Ontario, thus satisfying the location test.   And the dismasting of a vessel sailing on open navigable waters is both potentially disruptive to maritime commerce and substantially related to traditional maritime activity.   See, e.g., In re Felgate, No. 3:18-cv-910 (VLB), No. 3:17-cv-1286 (VLB), 2020 WL 1542372, at *6 (D. Conn. Mar. 30, 2020) (finding injury to person on vessel engaged in sailboat racing had both potential impact on maritime commerce and bore a significant relationship to traditional maritime activity).   The Grubart test is therefore met, vesting this Court with proper subject-matter jurisdiction.

## B. Petitioners' Motion for Summary Judgment

### 1. Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a).   A fact is "material" if it "might affect the outcome of the suit under the governing law."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).   An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   Id.

In deciding a motion for summary judgment, the evidence[5] and the inferences

---

5 A court resolving a motion for summary judgment considers only admissible evidence.   See Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."); Fed. R. Civ. P. 56 (c)(1)(B) (requiring that facts be supported by admissible evidence); Fed. R. Civ. P. 56 (c)(2) (permitting objections to inadmissible facts asserted at summary judgment stage).   As such, evidence and statements that would be inadmissible at trial, such as inadmissible hearsay, cannot be used to support or oppose summary judgment.   See Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004) ("an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial"); see also

11

drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. Anderson, 477 U.S. at 252. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); it must "offer some hard evidence showing that its version of the events is not wholly fanciful," D'Amico v. City of New York, 132 F.3d 145, 49 (2d Cir. 1998). That is, there must be evidence from which a factfinder could reasonably find for the nonmoving party. Anderson, 477 U.S. at 252.

In the end, the function of the court at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249; see also Jeffreys v. City of New York, 426 F.3d 549, 551 (2d Cir. 2005) ("district courts may not weigh evidence or assess the credibility of

---

Raskin, 125 F.3d at 66 ("Because the purpose of summary judgment is to weed out cases in which there is no genuine issue as to any material fact . . . it is appropriate for districts courts to decide questions regarding the admissibility of evidence on summary judgment.") (internal quotations and citations omitted).

witnesses at the summary judgment stage").  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

### 2. DeLeo's Claims

DeLeo asserts three claims: maintenance and cure; breach of the warranty of seaworthiness; and negligence.  Petitioners seek summary judgment on each claim. They first maintain that DeLeo cannot recover on her first two claims because she is not a seaman entitled to such relief.  Second, they argue that DeLeo has set forth only conclusory allegations of negligence.   This Court agrees with Petitioners on the first point but disagrees on the second.

### a. Petitioners are entitled to summary judgment on DeLeo's maintenance and cure and warranty of seaworthiness claims because DeLeo cannot establish that she is a seaman entitled to such remedies.

Historically, before enactment of the Jones Act, 46 U.S.C. §§ 30104, et seq., the general maritime law provided that seamen were entitled to "'maintenance and cure' from their employer for injuries incurred 'in the service of the ship' and to recover damages from the vessel's owners for 'injuries received by seamen in consequence of the unseaworthiness of the ship,' but they were 'not allowed to recover an indemnity for the negligence of the master, or any member of the crew.'"   Chandris, Inc. v. Latsis, 515 U.S. 347, 354, 115 S. Ct. 2172, 132 L. Ed. 2d 314 (1995) (quoting The Osceola, 189 U.S. 158, 175, 23 S. Ct. 483, 47 L. Ed. 760 (1903)).   The Jones Act removed the bar to suit for negligence, "thereby completing the trilogy of heightened legal protections (unavailable

to other maritime workers) that seamen receive because of their exposure to the perils of the sea."  Id. (internal quotation and citation omitted).

At issue here are the two remedies traditionally reserved to seamen under maritime law: maintenance and cure and the warranty of seaworthiness.   "Maintenance and cure is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service; and it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery." Vaughan v. Atkinson, 369 U.S. 527, 531, 82 S. Ct. 997, 8 L. Ed. 2d 88 (1962).   "The doctrine entitles an injured seaman to three [distinct] remedies—maintenance, cure, and wages."  Messier v. Bouchard Transp., 688 F.3d 78, 81 (2d Cir. 2012). Maintenance is the obligation to provide food and lodging; cure is the obligation to provide medical treatment; wages is the obligation to provide lost wages.  See Atl. Sounding Co. v. Townsend, 557 U.S. 404, 413, 129 S. Ct. 2561, 174 L. Ed. 2d 382 (2009); Lewis, 531 at 441 ("A claim for maintenance and cure concerns the vessel owner's obligation to provide food, lodging, and medical services to a seaman injured while serving the ship."); Messier, 688 F.3d at 81.

Unseaworthiness is a claim under general maritime law grounded in the vessel owner's duty to ensure that the vessel is reasonably fit to be at sea.  Lewis, 531 at 441. It is "essentially a species of liability without fault . . . neither limited by conceptions of negligence nor contractual in character.   It is a form of absolute duty owing to all within the range of its humanitarian policy."  Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94-95, 66 S. Ct. 872, 90 L. Ed. 1099 (1946); Barlas v. United States, 279 F. Supp. 2d 201, 206

14

(S.D.N.Y. 2003) ("The law of unseaworthiness has been described as a species of 'strict liability' or even a 'no fault doctrine'." (citation omitted)).   The standard is reasonableness, not perfection: vessel owners have "an absolute duty to furnish a ship, crew, and appurtenances reasonably fit for their intended service."   Oxley v. City of New York, 923 F.2d 22, 24-25 (2d Cir. 1991) (citing Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 545-50, 80 S. Ct. 926, 932, 4 L. Ed. 2d 941 (1960) ("The standard is not perfection, but reasonable fitness . . .")).   As such, "the meaning of seaworthiness is relative and varies with the vessel involved and the use for which the vessel is intended."   Atl. Specialty Ins. Co. v. Coastal Envtl. Grp. Inc., 945 F.3d 53, 68 (2d Cir. 2019) (citations and internal quotation marks omitted).

As indicated, these two remedies are generally reserved to seamen.   See Miles v. Apex Marine Corp., 498 U.S. 19, 27, 111 S. Ct. 317, 112 L. Ed. 2d 275 (1990) ("Historically, a shipowner's duty of seaworthiness under general maritime law ran to *seamen* in the ship's employ." (emphasis added)); The Osceola, 189 U.S. at 175 (finding that "the vessel and her owners are liable, in case a *seaman* falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued" and that "the vessel and her owners are . . . liable to an indemnity for injuries received by *seamen* in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship" (emphasis added)).

To qualify as a seaman entitled to maintenance and cure and the warranty of

seaworthiness, an individual must meet the definition of seaman under the Jones Act.[6] See 1 T. Schoenbaum, Admiralty & Maritime Law, § 6:28 (6th ed. 2018) ("The legal test for seaman status for purposes of maintenance and cure is the same as that established for determining status under the Jones Act."); id. § 6:27 ("[S]eaman status for purposes of the warranty of seaworthiness is accorded to that class of persons who may claim the protection of the Jones Act and the doctrine of maintenance and cure.").

Seaman status under the Jones Act is determined according to the test refined by the United States Supreme Court in Chandris.   Building on its previous observation that "[t]he key to seaman status is employment-related connection to a vessel in navigation," McDermott Int'l Inc. v. Wilander, 498 U.S. 337, 355, 111 S. Ct. 807, 112 L. Ed. 2d 866 (1991), the Court identified two "essential requirements" for seaman status under the Jones Act, Chandris, 515 U.S. at 368.

First, "an employee's duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission.'"   Id. (quoting Wilander, 498 U.S. at 355).   This is because "the Jones Act's protections, like the other admiralty protections for seamen, only extend to those maritime employees who do the ship's work."   Id.   Notably, satisfaction of his prong does not make one a seaman; it makes one *eligible* for seaman status.   Id. (noting that the first prong "is very broad: 'All who work at sea in the service of a ship' are *eligible* for seaman status." (emphasis in original) (quoting Wilander, 498 U.S. at 354)).

---

6 DeLeo does not assert a statutory Jones Act claim.   See Memorandum of Law, Docket No. 40-1, p. 5.

Second, "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." Chandris, 515 U.S. at 368.  The purpose of this requirement "is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." Id.  Consequently, "[a] maritime worker who spends only a small fraction of his working time on board a vessel is fundamentally land based and therefore not a member of the vessel's crew, regardless of what his duties are."  Id. at 371 (favorably citing the Fifth Circuit's rule of thumb that "[a] worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act").

Determining seaman status "is a mixed question of law and fact."  Id. at 369. Thus, if reasonable minds could differ in their application of the Chandris test, the question must go to the jury.  See id.

Petitioners maintain that they are entitled to summary judgment on DeLeo's maintenance and cure and seaworthiness claims because DeLeo cannot establish seaman status.  First, they argue that DeLeo is a land-based pension administrator, not a seafaring professional sailor.  She was not Petitioners' employee nor was she paid or compensated in any way for participating in the recreational races aboard the *Sound Wave*.  Second, Petitioners argue that DeLeo had an insubstantial connection to the

17

*Sound Wave*, both durationally and temporally.   She was a hobby sailor whose participation was voluntary, sporadic, and limited to less than 10 races in the 2018 season.

In response, DeLeo argues that disputed questions of material fact exist concerning her seaman status.   While conceding that she was not Petitioners' employee, DeLeo nonetheless maintains that she was a regular member of the *Sound Wave* "crew" and contributed to its purpose and mission—racing.   She further contends that she was a member of the crew for 15 years and regularly participated in the Thursday races.

Having considered the parties' arguments and the evidence presented, this Court finds that DeLeo has failed to set forth sufficient evidence from which it could be concluded that she qualifies as a seaman entitled to maintenance and cure or the warranty of seaworthiness.

As it relates to the first prong of the <u>Chandris</u> test—that the employee's duties must contribute to the function of the vessel or to the accomplishment of its mission—the record contains evidence that DeLeo assisted in the operation of the vessel.   For example, DeLeo testified that she served in the role of "floor deck," which involved "calling the line in the start of a race, helping the sail go back from port to starboard."   DeLeo Dep., p. 18.   And sometimes she would be "in the pit," which involved "pulling the lines."   <u>Id.</u>   At the time of the incident, DeLeo was "skirting the jib," helping to free it as it was being pulled in.   <u>Id.</u> p. 36.

But DeLeo did not perform these functions in an employment capacity; sailing was simply her hobby.   As the Supreme Court has observed, "the key to seaman status is

*employment-related* connection to a vessel in navigation."   Wilander, 498 U.S. at 354 (emphasis added).   This aligns with the central purpose of the Jones Act, which is "to protect those who are particularly vulnerable to the perils of the sea *as a result of their employment* and who, by tradition, have been wards of the admiralty law."   Fischer v. Nichols, 81 F.3d 319, 321 (2d Cir. 1996) (emphasis added) (citing Aguilar v. Standard Oil Co., 318 U.S. 724, 727-28, 63 S. Ct. 930, 87 L. Ed. 1107 (1943)).

DeLeo is employed as a land-based pension specialist with an accounting firm; she is not a maritime employee and was never paid or otherwise compensated for her participation on the *Sound Wave*.   See DeLeo Dep., pp. 8-9, 15, 30.   DeLeo has never owned her own boat, never had any formal training in sailboat operation, and is not a professional sailboat racer.   See id. pp. 11, 12, 30, 31.   She is a land-based employee who engages in sailboat racing recreationally.   Such individuals do not qualify for seaman status.   See, e.g., Knight v. Longaker, No. C 05-03481 SBA, 2007 WL 864870, at *5-10 (N.D. Cal. June 28, 2007) (finding "weekend sailing enthusiast" who was employed full time as a land-based language instructor failed to meet Chandris test and was not entitled to seaman status); Xanadu Maritime Tr. v. Meyer, 21 F. Supp. 2d 1104, 1107 (N.D. Cal. 1998) (finding recreational sailor did not qualify as a seaman under the Jones Act); Naglieri v. Bay, 977 F. Supp. 131, 135-36 (D. Conn. 1997)(finding no seaman status where the claimant "was an avid sailor, completed numerous sailing courses, owned several boats and participated in many races, [but] did not derive his livelihood from sea-based activities"); Hardesty v. Rossi, Civ. No. JFM-94-2320, 1995 WL 688416, at *4 (D. Md. Aug. 15, 1995) (finding that recreational sailboat racer who was not

employed by the vessel did not qualify as Jones Act seaman).   The first <u>Chandris</u> prong

is therefore not met.[7]   See <u>Wilander</u>, 498 U.S. at 348 ("Whether under the Jones Act or

general maritime law, seamen do not include land-based workers.").

As it relates to the second prong of <u>Chandris</u>—having a substantial connection to

a vessel in navigation in terms of both duration and nature—the record contains

insufficient evidence from which it could reasonably be concluded that this prong is met.

DeLeo testified that she sailed on the *Sound Wave* over her 15-year association with

Petitioners "when [she] was able to."   DeLeo Dep., p. 15.   In the nine years preceding

the dismasting, DeLeo participated in only the Thursday-night, women-only races.   <u>Id.</u> p.

17.   In 2018, DeLeo was on the *Sound Wave* at best only "8 to 10 times" for the

Thursday-night races, with each race lasting no more than 90 minutes.[8]   <u>Id.</u> pp. 24, 32-

33.   This is in line with the number of engagements found to be insufficient to satisfy this

prong in <u>Knight</u> (16 or 17), <u>Xanadu</u> (six), <u>Naglieri</u> (10), and <u>Hardesty</u> (three).   See <u>Knight</u>,

---

7 DeLeo's reliance on <u>Boy Scouts of America v. Graham</u> and <u>Petition of Read</u> do not help her cause.   86
F.3d 861 (9th Cir. 1996); 224 F. Supp. 241 (S.D. Fla. 1963).   In <u>Graham</u>, the Ninth Circuit determined that
agency principles should be used to determine whether a volunteer could be considered an employee for
purposes of qualifying as a Jones Act seaman.   See <u>Graham</u>, 86 F.3d at 865-66.   But <u>Graham</u> is factually
distinguishable because it involved a volunteer acting in a quasi-employment capacity instructing youth on
a vessel in navigable waters under the direction of a skipper, not a casual recreational sailboat racer.   See
<u>Graham</u>, 86 F.3d at 862-63.   <u>Graham</u> is further not instructive because it fails to recognize the import of
the traditional employment relationship as anchoring the maritime remedies available to seamen, see <u>id.</u> at
866-69 (Goodwin, J., dissenting) (noting that the history of maritime remedies is inconsistent with the
extension of seaman status to recreational boaters), and relies on pre-<u>Chandris</u> cases, see <u>id.</u> at 365-66.
And <u>Read</u>, which extended seaman status to a recreational boater, both pre-dates <u>Chandris</u> (by more than
30 years) and is directly inconsistent with <u>Chandris's</u> requirement that a seaman have an attachment to a
vessel that is substantial in both duration and nature.   See <u>Read</u>, 224 F. Supp. at 246 (finding "lack of long
continued attachment to the vessel" does not preclude "seaman" status).   In any event, even if DeLeo
could properly be viewed as an employee for seaman status purposes, she does not meet the second
<u>Chandris</u> prong, for the reasons stated in the body of this decision.

8 Sikorski testified that DeLeo was on the *Sound Wave* only three or four times in 2018.   See Sikorski
Dep., p. 14.

2007 WL 1864870, at *8; <u>Xanadu</u>, 21 F. Supp. 2d at 1106; <u>Naglieri</u>, 977 F. Supp. at 136;

<u>Hardesty</u>, 1995 WL 688416, at *4.

There is thus insufficient evidence from which it could reasonably be concluded

that DeLeo's connection to the *Sound Wave* was substantial in both duration and nature.

Moreover, the record evidence could not support a finding that DeLeo's involvement with

the vessel even began to approach the more-than-30%-of-the-time rule of thumb

discussed in <u>Chandris</u>.   See <u>Chandris</u>, 515 U.S. at 371 ("[a] maritime worker who spends

only a small fraction of his working time on board a vessel is fundamentally land based

and therefore not a member of the vessel's crew, regardless of what his duties are"); <u>see</u>

<u>also</u> <u>Hardesty</u>, 1995 WL 688416, at *4 (finding that recreational sailor with land-based

employment who spent less than 30 percent of her time in service to the vessel was not

a Jones Act seaman).

Consequently, regardless of her duties when actually sailing, DeLeo does not

qualify as a seaman under the Jones Act.   See <u>Chandris</u>, 515 U.S. at 371.   She was not

an employee of the *Sound Wave* nor did she have a substantial connection to the vessel

in duration or nature.   DeLeo is therefore not entitled to maintenance and cure or the

warranty of seaworthiness, two remedies that are reserved to traditional seamen

"because of their exposure to the perils of the sea."   <u>Id.</u> at 354.   Petitioners are therefore

entitled to summary judgment on these two claims.   See <u>id.</u> at 371 (providing that "where

undisputed facts reveal that a maritime worker has a clearly inadequate temporal

connection to vessels in navigation, the court may take the question from the jury by

granting summary judgment or a directed verdict").

21

**b. Petitioners are not entitled to summary judgment on DeLeo's negligence claims due to the existence of disputed issues of material fact.**

"Ordinary principles of common law negligence apply to a maritime negligence claim." Nagler, 246 F. Supp. 3d at 657 (citations omitted). A claimant must therefore establish legal duty, breach, causation, and damages. See Felgate, 2020 WL 1542372, at *10; In re Treanor, 144 F. Supp. 3d 381, 389 (E.D.N.Y. 2015). A vessel owner's duty "is one of reasonable care under the circumstances." Monteleone v. Bahama Cruise Line, Inc., 838 F.2d 63, 64-65 (2d Cir. 1988) (citing Rainey v. Paquet Cruises, Inc., 709 F.2d 169, 172 (2d Cir. 1983)); see also Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 630, 79 S. Ct. 406, 3 L. Ed. 2d 550 (1959). Breach occurs when an owner fails to take reasonable measures to prevent foreseeable injury. See Treanor, 144 F. Supp. 3d at 389 ("Under well-established principles of Second Circuit maritime negligence law, an owner breaches his or her legal duty of reasonable care by failing to take simple precautions to prevent foreseeable and serious injury.") (citing United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir. 1947)); Syverson v. Consol. Rail Corp., 19 F.3d 824, 826 (2d Cir. 1994) ("Reasonable care is determined in light of whether or not a particular danger was foreseeable."). As to causation, the claimant must "demonstrate that the owner's negligence constituted a 'substantial factor in producing' the injury." Nagler, 256 F. Supp. 3d at 658 (quoting Treanor, 144 F. Supp. 3d at 389).

DeLeo asserts that Petitioners were negligent in their maintenance and operation of the *Sound Wave*. She contends that White negligently repaired rather than replace

22

the *Sound Wave's* mast after the 2016 dismasting, and that Sikorski negligently sailed the *Sound Wave* on the night in question knowing that the shrouds were loose. According to DeLeo, these acts of negligence, either singly or in combination, caused or substantially contributed to the dismasting.   Petitioners maintain that they are entitled to summary judgment because DeLeo's claims are conclusory and any alleged negligent acts were not within their privity and knowledge.

Having reviewed the parties' arguments and the record evidence, this Court finds that disputed issues of material fact preclude summary judgment.   As it first relates to negligence arising out of the previous mast repair, there are several disputed issues that preclude summary judgment.   After the 2016 dismasting, White elected to have the mast professionally welded and repaired by a local company, rather than replace it.   See Sikorski Dep., pp. 20-26.   According to Sikorski, the repair consisted of welding a "support system" into the hollow mast at the point of the break.   See id. pp. 23-25.

But there is conflicting evidence concerning the "point of the break."   Id.   White testified that the mast cracked "right at the deck" at the end of the 2016 sailing season while the *Sound Wave* was being removed from the water.   See White Dep., pp. 19, 31. Sikorski, however, testified that the mast broke "about five to seven feet above the deck" after White accidently hit it with the "travel lift" he was using to remove boats from the water.   Sikorski Dep., pp. 20-21.   There is thus an issue concerning where the mast initially broke and where it was repaired.

And this relates to a further issue in dispute: the location of the break in the 2018 dismasting.   DeLeo testified that, in her opinion, the mast broke near the spot of the

previous weld repair, which, as just noted, is itself in dispute.   DeLeo Dep., p. 51.   This is based on her review of pictures of the mast that her husband took after the incident.   See id. p. 51.   Sikorski testified that the mast broke approximately one foot below the deck, which in her estimation was five or six feet below the previous weld repair.   Sikorski Dep., pp. 56-59.   White concluded post-dismasting that the mast broke in two places— at one of the spreaders and below deck.   White Dep., pp. 30-31.   Schneider is not sure whether the mast broke or just became separated but estimates that the break or separation occurred "very, very low towards the keel."   Schneider Dep., p. 91.   Disputed issues of material fact therefore exist as to what role, if any, the 2016 dismasting repair may have played in the 2018 dismasting.[9]

As it relates to whether Sikorski negligently sailed the *Sound Wave* on the night in question knowing that the shrouds were loose, there is again conflicting evidence. Shrouds are metal lines that run from the mast to the deck through spreaders.   DeLeo Dep., pp. 33, 55; Sikorski Dep., pp. 30-31; Schneider Dep., p. 14.   They stabilize the mast and secure the mast to the deck.   DeLeo Dep., pp. 33, 55; Sikorski Dep., pp. 30-31, 61; Schneider Dep., pp. 13, 28, 41.

There is conflicting evidence concerning whether the shrouds were loose and whether anyone informed Sikorski that they were loose.   DeLeo testified that, in her experience, the shrouds should be "somewhat tight to hold the mast in," but on the evening of the incident, the shrouds were loose.   DeLeo Dep., pp. 33, 34, 52-55, 77.

---

[9] This Court notes that the insurance adjuster observed the 2016 repair but concluded that it did "not appear to have any bearing on this incident."   Docket No. 40-9.

She recalls Schneider wiggling and shaking the shrouds as the *Sound Wave* sailed to the start of the race and saying, "these are really loose." Id. pp. 33, 34, 55, 79.

As Schneider shook the shrouds, DeLeo observed play in them and also thought that they seemed loose near the lower spreader about 5' 8" above the deck. See id., pp. 53-55, 79. DeLeo testified that she believed the shrouds were "looser than normal" and that she had never seen the shrouds that loose in her previous outings on the *Sound Wave*. Id. pp. 55, 80. She further testified that she heard Schneider tell Sikorski and everyone else on the boat that the shrouds were loose. See id. pp. 34, 55, 79. In response, DeLeo heard Sikorski say, "I know . . . Just don't touch them." Id. pp. 35, 55.

Sikorski and Schneider directly refute DeLeo's account. Sikorski testified that she does not recall anyone, including Schneider, telling her that the shrouds were loose on the evening of the incident. Sikorski Dep., p. 60. Schneider testified that she had no problem with the way the shrouds were rigged and does not recall telling DeLeo or Sikorski that there were any issues with the shrouds. Schneider Dep., pp. 41, 42-43, 95. Schneider further testified that loose shrouds would not have concerned her anyway because "you don't want them too tight." Id. p. 95.

In addition to allegedly operating the *Sound Wave* with loose shrouds, there is evidence suggesting that Sikorski may also have raced despite knowing that the deck around the mast was in disrepair. DeLeo testified that the *Sound Wave's* fiberglass deck was "soft" during the 2018 racing season and on the evening of the incident. DeLeo Dep., pp. 23-24, 77. She further maintains that Schneider told Sikorski that the deck was soft. See id. p. 24. But Sikorski does not recall any portions of the deck being soft on

25

the day in question, and Schneider testified that while the deck had some give, it was not in an unusually abnormal condition and was not a concern.   Sikorski Dep., p. 62; Schneider Dep., pp. 43-44, 65, 85.   And both Sikorski and Schneider testified that the *Sound Wave* was in good shape in August 2018 and was regularly maintained and generally kept in good repair. Sikorski Dep., p. 29; Schneider Dep., pp. 29-30, 33. Disputed issues of material fact therefore exist as to whether Sikorski negligently operated the *Sound Wave* with loose shrouds or a soft deck or both.

Moreover, the cause of the August 2018 dismasting is ultimately in dispute. DeLeo maintains that the previous repair or loose shrouds or a combination of the two resulted in or substantially contributed to the dismasting.   Evidence from the post-dismasting inspection of the vessel by Consolidated Marine Services, Inc., partially supports DeLeo's theory.   Consolidated described the cause of the loss as follows: "Demasting. The amidships rod rigging guides came out of the lower spreader (port side) and when the [sic] changed tack, the rigging was not in place to secure the mast."   See Docket No. 40-9.[10]   White also surmised, based on his own post-dismasting inspection, that shrouds separated from the spreader, causing the mast to break in two places. White Dep., pp. 16, 30-31, 34-45; Sikorski Dep., p. 60.   In fact, White specifically alerted the insurance adjuster (Consolidated) to the condition of the shrouds.   See White Dep., p. 18.   Neither Sikorski nor Schneider know why the mast broke.   Sikorski Dep., p. 59;

---

[10] Petitioners maintain that Consolidated's report is "inadmissible hearsay," see Reply Memorandum of Law, Docket No. 44, p. 9, but they do not elaborate on this contention or establish that the report is inadmissible.   They also do not account for the possibility of witness testimony from Consolidated pertaining to the inspection and conclusions in the report.

Schneider Dep., p. 62.

Finally, there are disputed issues of material fact concerning whether DeLeo was even struck by the mast.   For example, DeLeo contends that the mast landed on her and pinned her face-down to the top of the cabin, causing her personal injuries, including spinal fractures and shoulder impingement.  <u>See</u> Claimant's Response, ¶ 41; DeLeo Dep., p. 38.   Sikorski testified that the mast and rigging could not have hit DeLeo because they "fell as one big piece down the starboard side into the water."   Sikorski Dep., p. 51. Schneider testified that neither the mast nor rigging hit DeLeo because it all fell into the water, not onto the deck.   Schneider Dep., pp. 56, 83, 97, 98.

Viewing the evidence in the light most favorable to DeLeo and making all inferences in her favor, this Court finds that the existence of disputed issues of material fact precludes summary judgment on DeLeo's negligence claims.   This extends to Petitioners' privity and knowledge, which can only be determined once the material factual issues are resolved.

### IV. CONCLUSION

For the reasons stated above, this Court finds that Petitioners are entitled to summary judgment on DeLeo's maintenance and cure and warranty of seaworthiness claims because DeLeo cannot establish that she qualifies as a seaman entitled to such relief, but that summary judgment is precluded on DeLeo's negligence claims due to the existence of disputed issues of material fact.   Petitioners' motion for summary judgment will therefore be granted in part and denied in part.   Before proceeding to a *concursus* proceeding, the parties must engage in mediation to determine whether a pretrial

resolution of this matter can be reached.

## V.   ORDERS

IT HEREBY IS ORDERED, that Petitioners' Motion for Summary Judgment (Docket No. 33) is GRANTED in part and DENIED in part, consistent with this Decision and Order.

FURTHER, that this case is REFERRED for alternative dispute resolution under Section 2.1.B of the Plan for Alternative Dispute Resolution in the United States District Court for the Western District of New York ("the ADR Plan").

FURTHER, that the parties shall comply with all relevant requirements of the ADR Plan, which is available at http://www.nywd.uscourts.gov.

FURTHER, that within 10 days of the entry date of this decision, the parties shall contact ADR Administrator Amanda G. Williams for direction on how to proceed with mediation under the March 16, 2020 General Order Re: Alternate Dispute Resolution Under Circumstances Created by COVID-19 and its progeny.

FURTHER, that the parties are permitted to re-engage in mediation with Mediator Douglas Coppolla or another federal-court mediator upon whom they might agree.

FURTHER, that the parties shall conclude their mediation efforts and file a joint written notice concerning the status of mediation by July 25, 2022.

SO ORDERED.

Dated:       May 13, 2022
             Buffalo, New York

                                        s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        United States District Judge

28